**AMERICAN PUBLIC GAS ASSOCI-ATION, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**Shell Oil Company et al., Intervenors.**

**CONTINENTAL OIL COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**Aztec Oil and Gas Company et al., Intervenors.**

**No. 71–1812, 71–1873.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 26, 1972.

Decided May 23, 1974.

Rehearing Denied July 17, 1974.

---

14. 26 U.S.C. § 5845 (82 Stat. 1230).

15. Tr. at 64. Appellant also admitted knowing that the gun was loaded. *Id.*

Charles F. Wheatley, Jr., Washington, D. C., for petitioner in No. 71–1812.

Thomas H. Burton, Houston, Tex., for petitioner in No. 71–1873.

Joan E. Heimbigner, Atty., Federal Power Commission with whom Gordon Gooch, Gen. Counsel, Leo E. Froquer, Sol., and George W. McHenry, Jr., First Asst. Sol., Federal Power Commission were on the brief, for respondent. J. Richard Tiano, First Asst. Sol., Federal Power Commission at the time the record was filed, also entered an appearance for respondent.

John R. Rebman, Bartlesville, Okl., with whom Martin N. Erck and J. Kirby Ellis, Houston, Tex., were on the brief, for intervenors, Humble Oil and Refining Co.

Tilford A. Jones, Bethesda, Md., with whom William A. Mogel, Bethesda, Md. whom William A. Mogel, Bethesda, Md., was on the brief, for intervenor, United Distribution Companies.

Kenneth Heady and John L. Williford, Bartlesville, Okl., were on the brief for intervenor, Phillips Petroleum Co.

Thomas G. Johnson and Dan A. Bruce, Houston, Tex., were on the brief for intervenor, Shell Oil Co.

Kirk W. Weinert and C. Fielding Early, Jr., Houston, Tex., were on the brief for intervenor, Texaco, Inc. J. Donald Annett, Washington, D. C., also entered an appearance for intervenor, Texaco Inc.

Edwin S. Nail, Boston, Mass., was on the brief for intervenor,. Amerada Hess Corp.

John E. Watson, Houston, Tex., entered an appearance for intervenor, Tenneco Oil Co. in No. 71–1873.

Charles E. McGee, Washington, D. C., entered an appearance for intervenor, Atlantic Richfield Co. in No. 71–1873.

Oliver Barr McClellan entered an appearance for intervenor, Aztec Oil and Gas Co. in No. 71–1873.

Before DANAHER, Senior Circuit Judge, and MacKINNON, and ROBB, Circuit Judges.

PER CURIAM:

This case presents three questions: (1) whether the Federal Power Commission properly determined initial rates for independent producer areas under its rulemaking authority; (2) whether the procedures adopted by the Commission met the requirements of due process; and (3) whether the initial rates established by the Commission for the Rocky Mountain area are supported by substantial evidence. We answer each question in the affirmative.

The case commenced on June 17, 1970 when the Commission issued a Notice of Investigation and Proposed Rulemaking in Docket No. R–389, 35 Fed.Reg. 10152 (1970). In its notice the Commission proposed to issue rules fixing the terms and conditions under which it would issue permanent certificates of public convenience and necessity for any sales of natural gas subject to the Commission's jurisdiction in the Permian Basin area. The rules were to apply to any sales of natural gas under contracts dated after the date of issuance of the rules. The notice stated: "The rates to be set pursuant to this rulemaking will be firm rates, not subject to refund obligation. However, any rate set will be subject to prospective modification at the conclusion of the new Permian Basin area rate proceeding which we have today instituted by separate order in Docket No. AR70–1, 35 F.R."

On July 17, 1970 the Commission issued a further notice of proposed rulemaking in Docket No. R–389A, 35 Fed. Reg. 11638 (1970), expanding the scope of the proposed rulemaking in Docket No. R–389 from the Permian Basin area to include all new sales of natural gas, nationwide.

The Commission's notices stated:

As an aid to interested parties (hereinafter "parties") in preparing responses, and as notice to those who may be examined in this investigation, we set forth specific areas of inquiry, the purpose of which is to determine the terms and conditions which will result in an adequate supply of natural gas for consumers at the lowest rate consistent with maintaining an industry structure capable of providing, and motivated to provide, service with its attendant risks. (J.A. 45.)

Specifically, the Commission called on all parties to submit three types of information: (1) an estimate of the current nationwide cost of finding and producing nonassociated natural gas, using the costing methods of Opinions Nos. 468 and 546; (2) rate of return and other factors discussed in Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312, rehearing denied, 392 U.S. 917, 88 S.Ct. 2050, 20 L.Ed.2d 1379 (1968), and Austral Oil Co. v. F.P.C., 428 F.2d 407 (5th Cir.), cert. denied, 400 U.S. 950, 91 S.Ct. 243, 27 L.Ed.2d 257 (1970); and (3) the weight to be given to contract prices, terms and inducements or commodity value, in considering producer rates, and whether the market mechanism would protect consumer interests.

The Commission required parties to serve copies of their comments on all

other parties (R. 2472) and scheduled public hearings in several locations, to allow interested persons to state their views in lieu of filing written comments. (R. 2471, 2490, 2544.) The Commission provided an opportunity to reply to original submittals. (R. 2472.)

The Commission also designated two staff attorneys as investigative officers empowered to receive evidence and documents deemed relevant and material to the inquiry. These officers conducted an investigation of intrastate sales by 48 large natural gas producers in the Permian Basin area and 70 large producers in other areas. (R. 2493–95, 2551–53, 2504, 2561–62.) The officers directed the producers to appear, checked their contracts and responses to a questionnaire, and compiled therefrom a composite of weighted average rates and range of rates for intrastate sales in each area. (R. 2506–11, 2519–20, 2565–2611.) These data were received by the Commission on August 14, 1970, and September 9, 1970.

On their petitions to intervene, the Commission, by order dated October.19, 1970, granted intervention to ten cities, state regulatory commissions, and states (R. 1105–06.) Sixty-nine written initial submittals were received by the Commission from parties, including our petitioner Continental Oil Company and other producers (R. 1314–22, 1987–2082) and the Commission staff. (R. 1107–2292.) Public hearings were held in eight major cities [1] and transcripts of the testimony and exhibits were made available to all interested persons. Thereafter, the Commission received thirteen written replies to the initial submittals. (R. 2293–2468.) These replies included one from Texaco, joined by Continental and other producers. (R. 2413–2440.)

On July 15, 1971 the Commission issued Order No. 435 entitled Opinion and Order Establishing Initial Rates in the Rocky Mountain Area. (R. 2651–77.) In that opinion and order the Commission, among other things, essentially made the following determinations:

1. That the proceeding constituted a rulemaking proceeding under the Administrative Procedure Act (R. 2656);

2. That the rulemaking procedures adopted in the proceeding complied with the requirements of the Administrative Procedure Act, the Natural Gas Act, and the constitutional standard of due process (R. 2656–57);

3. That no party had made allegations sufficient to require an adjudicatory hearing with cross-examination (R. 2657–58);

4. That an acute shortage of natural gas exists for present and future markets (R. 2660);

5. That the initial rates set for the Rocky Mountain area should increase the gas supplies available to the interstate market and afford some appreciable relief to pipeline purchasers in the area (R. 2666);

6. That the initial rates at which sales of natural gas in the Rocky Mountain area are to be certificated, without refund obligation, for sales made under contracts dated after June 17, 1970, are:

|  | Rates in Cents Per Mcf at 15.025 psia |
| --- | --- |
| Aneth Field | 22.50 |
| San Juan | 24.00 |
| Uinta—Green River | 23.75 |
| Colorado—Julesburg Basin | 23.50 |
| Montana—Wyoming | 22.75 |
| Montana—Dakota | 23.50 |

(R. 2674.)

7. That such initial rates represent the rate levels for the area involved until such time as the Commission shall promulgate just and reasonable rates in that area (R. 2674).

---

1. Midland, Texas (R. 1–1316); New Orleans (R. 317–95); Denver (R. 396–582); Pittsburgh (R. 583–681); Chicago (R. 682–874); Los Angeles (R. 875–988); New York (R. 989–1026); and Boston (R. 1027–1054). *See* Brief for Respondent Federal Power Commission, p. 11, n. 9.

The petitioners contend that the Commission may not determine initial rates without a formal adjudicatory or "evidentiary" hearing, and that the rulemaking proceedings were a denial of due process.

■■ As proposed in the Notice of Rulemaking and stated in the Commission's Order No. 435 the rates established were "initial rates at which sales of natural gas in the Rocky Mountain Area are to be certificated, without refund obligation, for sales made under contracts dated after June 17, 1970" and "represent the area rate levels for the areas involved until such time as the Commission shall promulgate just and reasonable rates in said area." We think this determination of initial rates pursuant to rulemaking proceedings complies with the requirements of the Natural Gas Act and the Administrative Procedure Act.

The Commission acted pursuant to sections 16 and 4, 5, 7 of the Natural Gas Act, 15 U.S.C. §§ 717o and 717c, 717d and 717f. It is settled that the Commission has authority to regulate initial producer rates under section 7 of the Act. Atlantic Refining Co. v. Public Service Commission of N.Y. (CATCO), 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959). Since neither section 16 nor section 7 provides that rules must be made "on the record after opportunity for an agency hearing" (5 U.S.C. § 553(c)) these sections on their face do not require the Commission to follow the formal procedures of sections 556 and 557 of the Administrative Procedure Act, 5 U.S.C. §§ 556 and 557. The Commission is not forced to adopt the procedures of a trial, with formal hearings, oral testimony under oath, cross examination and the like. Evidentiary submission in written form may be sufficient. United States v. Florida East Coast Rwy Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); FPC v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112, rehearing denied, 377 U.S. 984, 84 S.Ct. 1881, 12 L.Ed.2d 753

(1964); Mobil Oil Corp. v. FPC, 157 U.S.App.D.C. 235, 483 F.2d 1238 (1973).

As we said in City of Chicago v. FPC, 147 U.S.App.D.C. 312, 324–325, 458 F.2d 731, 743–744 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972):

. . . Whatever procedure is utilized, a primary objective is the acquisition of information which will enable the Commission to carry out effectively the provisions of the Natural Gas Act. The ability to choose with relative freedom the procedure it will use to acquire relevant information gives the Commission power to realistically tailor the proceedings to fit the issues before it, the information it needs to illuminate those issues and the manner of presentation which, in its judgment, will bring before it the relevant information in the most efficient manner.

The procedure chosen by the Commission must of course give the parties fair notice of exactly what the Commission proposes to do, together with an opportunity to comment, to object, and to make written submissions; and the final order of the Commission must be based upon substantial evidence. *See* United States v. Florida East Coast Rwy Co., *supra*, 410 U.S. 224, 241, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). We think the Commission's procedures here meet this test.

In its notices of investigation and proposed rulemaking the Commission stated exactly what it proposed to do. Without limiting the scope of any submittals on the issues the Commission then indicated the methodology it proposed to follow, setting forth specific areas of inquiry and requesting relevant information. Procedures were established for the collection of data relating to intrastate contracts, and such data were collected from many producers. Public hearings were held in eight major states and comments and submittals were received from all interested parties, including petitioner Continental Oil Company and

other producers. Replies to the initial submittals were also received from Continental and others. All submittals, replies, comments, transcripts and data were made available to all parties. In short, the procedures resulting in Order No. 435 fully complied with the requirements of section 553 of the Administrative Procedure Act.

■ The petitioners complain that they were denied the right to test through cross examination the underlying bases for the submitted data. Even in a formal adjudicatory hearing under the APA, however, cross examination is not always a right. Thus section 556(d), 5 U.S.C. 556(d) provides in part:

> A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, *and to conduct such cross-examination as may be required for a full and true disclosure of the facts.* In rule making or determining claims for money or benefits or applications for initial licenses an agency may, when a party will not be prejudiced thereby, *adopt procedures for the submission of all or part of the evidence in written form.* [Emphasis added.]

Here we think the petitioners have failed to demonstrate that cross examination was required for a full and true disclosure of the facts. All submittals and data upon which the Commission relied were tendered to the petitioners for comment, analysis, dissection and criticism, and for the submittal of rebutting material. Although the petitioners claim that cross examination of live witnesses was necessary they do not point to any specific weakness in the proof which might have been explored or developed more fully by that technique than by the procedures adopted by the Commission. We are told in general that the issues of costs, gas supply and rate of return might have been explored, but the petitioners do not suggest what questions were necessary for this purpose, nor do they explain why their written submittals were ineffectual. In the circumstances we cannot say that

the rights of the petitioners have been prejudiced. *See* Long Island RR Co. v. United States, 318 F.Supp. 490, 499 (E.D.N.Y.1970).

■ In summary we hold that the procedures employed by the Commission accorded due process to the petitioners. The issues were clearly stated from the outset and the petitioners were given an adequate opportunity to participate in developing evidence bearing upon those issues. There is no reason to believe that the exchanges or dialogue between and among the parties were so inadequate as a mechanism for finding the facts that a trial-type proceeding was necessary. That the procedures were streamlined did not make them improper or unconstitutional. In these respects this case is distinguished from Mobil Oil Corp. v. FPC, 157 U.S.App.D.C. 235, 483 F.2d 1238 (1973). In the *Mobil Oil* case there was no adequate notice, and much of the data relied upon by the Commission was provided in an informal and to some extent *ex parte* conference, as distinguished from an adversary setting.

The Commission based its determination of initial rates on four principal factors: (1) the demand for and supply of natural gas in the interstate market; (2) the terms of contracts for gas sales in competing intrastate markets; (3) the current nationwide cost of finding and producing new nonassociated gas, using the methods set forth in the *Permian Basin* and *Austral Oil Company (Southern Louisiana I)* proceeding; and (4) rate of return, taking into consideration the risk involved in exploring for and developing new gas reserves.

With respect to demand and supply the Commission found:

> No party, not even those who aver an extensive adjudicatory hearing is here required by law, has denied the existence of a critical natural gas shortage. Many pipeline and distribution companies introduced testimony and evidence as to their difficulties in obtaining adequate supplies of gas.

\* \* \* \* \* \*

Adding to the problem is that the increase in demand for gas has been greater than was anticipated. The staff shows that the total demand for natural gas has increased from about 10 trillion cubic feet in 1956 to about 21.4 trillion cubic feet in 1969.

Several of the parties emphasize the magnitude of the potential reserves that might be realized from greater incentive for exploration and development of new supplies.

\* \* \* \* \* \*

However, the overwhelming evidence is that the difficulty is the lack of financial incentive to undertake drilling ventures in order to discover and develop these extensive reserves.

\* \* \* \* \* \*

We find, therefore, from all of the evidence before us that an acute shortage of natural gas supplies for the existing and future markets in this country does exist, and will continue to exist, if not worsen, in the foreseeable future. Action by this Commission is therefore desirable. We also find that this Commission must, in the discharge of its responsibility under the Natural Gas Act, create and afford a greater incentive for producers of natural gas, whether they be independent, integrated or pipeline producers, to seek and find added supplies of natural gas. We further find that sufficient evidence exists that there is available undiscovered natural gas reserves which if given the necessary incentive, can be found and produced to meet the present and future demands of the country. (R. 2658–2660.)

As for intrastate markets the Commission said:

We have noted from the report filed by our investigating officers in these proceedings, on September 9, 1970, that the weighted average intrastate prices for gas in the Rocky Mountain Area have risen from 15.10 cents to 18.05 cents per Mcf during the period 1966 to 1970. Thus, we are faced here too with an upward trend in prices offered by intrastate buyers. This is merely one more economic factor we must consider. (R. 2671.)

The report to which the Commission referred occupies sixty-one (61) pages in the record (R. 2551–2612) and reflects a composite of data received from producers having relevant intrastate sales of natural gas.

The Commission had before it itemized cost estimates submitted by (1) the Commission staff (R. 1428); (2) the Producers Group (Texaco) including Continental (R. 2417); (3) the California Distributor Group (R. 1258); and (4) United Distribution Companies (R. 2249). The Commission's order included a composite of these data (R. 2672) which showed that the estimates ranged from 20.65 cents per Mcf, according to United Distribution Companies, to 31.63 cents per Mcf submitted as an alternative by the Producers Group in their response presentation. The initial presentation by the Producers estimated a cost of 25.68 cents per Mcf. Concluding that the initial presentation of the Producers Group was the more acceptable, the Commission found that "the cost range narrows to a difference from a low of 20.65 cents to 25.68 cents ($.2671)."

Only the staff and the Texaco Group introduced testimony and evidence regarding the proper rate of return to be used in the computation of cost of production. The staff introduced cost evidence using a 12% and a 13% rate of return and the staff witness recommended that the 13% rate be used. (R. 1402.) The Producers Group presented cost of service using 12%, 13% and 16% rates. (R. 1995–1998.) Texaco and one other company individually recommended the use of the 16% rate. Considering these estimates in the light of the risk in exploring for and producing gas the Commission concluded that

[A] return on common equity of approximately 15 percent would be fully justified, and would reflect past histo-

ry for companies confined to the producing function.

We find a rate of return of approximately 15 percent proper to be used in these proceedings. (R. 2670.)

Continental argues that the Commission improperly determined initial rate levels solely on the basis of cost comments, and that in any event the rates established were inadequate to promote necessary and future gas supplies.

■■ We need not labor the point that the Commission has wide discretion in deciding what factors to consider in certifying initial rates as required by public convenience and necessity, FPC v. Sunray DX Oil Co., 391 U.S. 9, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968); United Gas v. Callery Properties, 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965), rehearing denied, 382 U.S. 1001, 86 S.Ct. 526, 15 L.Ed.2d 491 (1966); Atlantic Refining Co. v. Public Service Commission of N.Y. (CATCO), 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959), and cost is one factor which may be considered, Permian Basin Area Rate Cases, 390 U.S. 747, 815, 88 S.Ct. 1344, 20 L. Ed.2d 312 (1968). As we have indicated moreover the record discloses that the Commission did consider factors other than cost comments; contrary to the contention of Continental evidence concerning intrastate sales and supply and demand was considered. We must also decline Continental's invitation to hold that the rates established were too low. There is no showing that the rates are outside "the 'zone of reasonableness' within which the courts may not set aside rates adopted by the Commission." FPC v. Sunray DX Oil Co., 391 U.S. 9, 29, 88 S.Ct. 1526, 1537, 20 L.Ed.2d 388 (1968).

We think the Commission's orders sufficiently articulated and explained the reasoning and factual basis of the conclusions reached; and considering the record as a whole we find that the orders were supported by substantial evidence.

The orders of the Commission are

Affirmed.