SEACOAST ANTI–POLLUTION
LEAGUE et al., Petitioners,

v.

Douglas M. COSTLE, as Administrator
of the Environmental Protection
Agency, Respondent,

Public Service Company of New
Hampshire, Intervenor.

No. 77–1284.

United States Court of Appeals,
First Circuit.

Argued Nov. 10, 1977.

Decided Feb. 15, 1978.

As Amended Feb. 23, 1978.

874

Robert A. Backus, Manchester, N. H., and Harvey N. Winchester, Denver, Colo., with whom O'Neill, Backus, Spielman, Little, Manchester, N. H., for petitioner.

Fred R. Disheroon, Atty., Dept. of Justice, and William F. Pedersen, Atty., Environmental Protection Agency, Washington, D. C., with whom Sanford Sagalkin, Acting Asst. Atty. Gen., Juneau, Alaska, was on brief, for respondent.

Harrison A. Fitch, Boston, Mass., with whom Ronald A. Zumbrun, Raymond M. Momboisse, Robert K. Best, Sacramento, Cal., Albert Ferri, Jr., Washington, D. C., Donald C. Simpson, Lawrence P. Jones, Washington, D. C., Wayne S. Henderson, Boston, Mass., and Peter D. Kinder, Columbus, Ohio, were on brief, for intervenor, The New Hampshire Voice of Energy.

John C. Ottenberg, Boston, Mass., and Harvey N. Winchester, Denver, Colo., on brief for amicus curiae, Conservation Law Foundation of New England, Inc.

Thomas G. Dignan, Jr., Boston, Mass., with whom John A. Ritsher and Ropes & Gray, Boston, Mass., were on brief, for intervenor, Public Service Co. of New Hampshire.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

This case is before us on a petition by the Seacoast Anti-Pollution League and the Audubon Society of New Hampshire (petitioners) to review a decision by the Administrator of the Environmental Protection Agency (EPA). We have jurisdiction under 33 U.S.C. § 1369(b)(1). The petition presents several important issues relating to the applicability and effect of the Administrative Procedure Act (APA), 5 U.S.C. §§ 501 *et seq.*, and the interpretation of the Federal Water Pollution Control Act of 1972 (FWPCA), 33 U.S.C. §§ 1251 *et seq.* In order to place those issues in context we set forth the procedural and factual background of the case.

The Public Service Company of New Hampshire (PSCO) filed an application with the EPA for permission to discharge heated water into the Hampton-Seabrook Estuary which runs into the Gulf of Maine. The water would be taken from the Gulf of Maine, be run through the condensor of PSCO's proposed nuclear steam electric generating station at Seabrook, and then be directly discharged back into the Gulf at a temperature 39°F higher than at intake. The water is needed to remove waste heat, some 16 billion BTU per hour, generated by the nuclear reactor but not converted into electrical energy by the turbine. Occasionally, in a process called backflushing, the water will be recirculated through the condensor, and discharged through the intake tunnel at a temperature of 120°F in order to kill whatever organisms may be living in the intake system.

Section 301(a) of the FWPCA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant unless the discharger, the point source operator, has obtained an EPA permit. Heat is a pollutant. 33 U.S.C. § 1362(6). Section 301(b) directs the EPA to promulgate effluent limitations. The parties agree that the cooling system PSCO has proposed does not meet the EPA standards because PSCO would utilize a once-through open cycle system—the water would not undergo any cooling process before being returned to the sea.[1] Therefore, in August, 1974, PSCO applied not only for a discharge permit under § 402 of the FWPCA, 33 U.S.C. § 1342, but also an exemption from the EPA standards pursuant

---

1. The Fourth Circuit's remand of the EPA's regulations on this point does not disturb the parties' agreement. *Appalachian Power Co. v. Train*, 545 F.2d 1351 (4th Cir. 1976).

to § 316 of the FWPCA, 33 U.S.C. § 1326. Under § 316(a) a point source operator who "after opportunity for public hearing, can demonstrate to the satisfaction of the Administrator" that the EPA's standards are "more stringent than necessary to assure the projection [*sic*] and propagation of a balanced, indigenous population of shellfish, fish, and wildlife in and on the body of water" may be allowed to meet a lower standard. Moreover, under § 316(b) the cooling water intake structure must "reflect the best technology available for minimizing adverse environmental impact."

In January, 1975, the Regional Administrator of the EPA held a non-adjudicatory hearing at Seabrook. He then authorized the once-through system in June, 1975. Later, in October, 1975, he specified the location of the intake structure. The Regional Administrator granted a request by petitioners that public adjudicative hearings on PSCO's application be held. These hearings were held in March and April, 1976, pursuant to the EPA's regulations establishing procedures for deciding applications for permits under § 402 of the FWPCA, 40 C.F.R. § 125.36. The hearings were before an administrative law judge who certified a record to the Regional Administrator for decision. The Regional Administrator decided in November, 1976, to reverse his original determinations and deny PSCO's application.

PSCO, pursuant to 40 C.F.R. § 125.36(n), appealed the decision to the Administrator who agreed to review it. Thereafter, a new Administrator was appointed, and he assembled a panel of six in-house advisors to assist in his technical review. This panel met between February 28 and March 3, 1977, and submitted a report finding that with one exception PSCO had met its burden of proof. With respect to that exception, the effect of backflushing, the Administrator asked PSCO to submit further information, offered other parties the opportunity to comment upon PSCO's submission, and stated that he would hold a hearing on the new information if any party so requested and could satisfy certain threshold conditions (set out below). Petitioners did request a hearing, but the Administrator denied the request.

The Administrator's final decision followed the technical panel's recommendations and, with the additional information submitted, reversed the Regional Administrator's decision, finding that PSCO had met its burden under § 316.[2] It is this decision that petitioners have brought before us for review.

*Applicability of the Administrative Procedure Act*

Petitioners assert that the proceedings by which the EPA decided this case contravened certain provisions of the APA governing adjudicatory hearings, 5 U.S.C. §§ 554, 556, and 557. Respondents answer that the APA does not apply to proceedings held pursuant to § 316 or § 402 of the FWPCA, 33 U.S.C. §§ 1326, 1342.[3]

The dispute centers on the meaning of the introductory phrases of § 554(a) of the APA:[4]

---

2. The EPA proceedings went forward concurrently with proceedings before the Nuclear Regulatory Commission. The NRC had not yet finished its review of PSCO's application for a construction permit for the Seabrook plant.

3. There is some dispute as to whether this was a proceeding pursuant to § 316 or § 402 of the FWPCA. The substantive standards are drawn from § 316 which authorizes less stringent effluent limitations than would otherwise be imposed if the point source operator can still assure "the protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife in and on the body of water into which the discharge is to be made." The

EPA conducted the hearings by procedures analogous to the procedures for hearings on applications for permits under the National Pollutant Discharge Elimination System, § 402. We are of the opinion, however, that the distinction does not make any difference. Both sections direct the administrator to make his decision "after opportunity for public hearing", and the substantive character of the decision in each case is very similar. For convenience, we will refer to this as a § 316 proceeding.

4. The determination that the EPA must make under § 316 of the FWPCA is not a rule because it is not "designed to implement, interpret, or prescribe law or policy". 5 U.S.C.

"This section applies . . . in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing . . ." Both § 316(a) and § 402(a)(1) of the FWPCA provide for public hearings, but neither states that the hearing must be "on the record". We are now the third court of appeals to face this issue. The Ninth Circuit and the Seventh Circuit have each found that the APA does apply to proceedings pursuant to § 402. *Marathon Oil Co. v. EPA*, 564 F.2d 1253 (9th Cir. 1977); *United States Steel Corp. v. Train*, 556 F.2d 822 (7th Cir. 1977). We agree.

▪ At the outset we reject the position of intervenor PSCO that the precise words "on the record" must be used to trigger the APA. The Supreme Court has clearly rejected such an extreme reading even in the context of rule making under § 553 of the APA.[5] *See United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 245, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 757, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). Rather, we think that the resolution of this issue turns on the substantive nature of the hearing Congress intended to provide.[6]

▪ We begin with the nature of the decision at issue. The EPA Administrator must make specific factual findings about the effects of discharges from a specific point source. On the basis of these findings the Administrator must determine whether to grant a discharge permit to a specific applicant. Though general policy considerations may influence the decision, the decision will not make general policy. Only the rights of the specific applicant will be affected. "As the instant proceeding well demonstrates, the factual questions involved in the issuance of section 402 permits will frequently be sharply disputed. Adversarial hearings will be helpful, therefore, in guaranteeing both reasoned decisionmaking and meaningful judicial review. In summary, the proceedings below were conducted in order 'to adjudicate disputed facts in particular cases,' not 'for the purposes of promulgating policy-type rules or standards.'" *Marathon Oil Co., supra* at 1262.

This is exactly the kind of quasi-judicial proceeding for which the adjudicatory procedures of the APA were intended. As the Supreme Court has said, "Determination of questions of [the Administrative Procedure Act's] coverage may well be approached through consideration of its purposes as disclosed by its background." *Wong Yang Sung v. McGrath*, 339 U.S. 33, 36, 70 S.Ct. 445, 448, 94 L.Ed. 616 (1950). One of the developments that prompted the APA was the "[m]ultiplication of federal administrative agencies and expansion of their functions to include adjudications which have serious impact on private rights." *Id.*, 339 U.S. at 36–37, 70 S.Ct. at 448. This is just such an adjudication. The panoply of procedural protections provided by the APA is necessary not only to protect the rights of

§ 551(4). Rather the EPA must decide a specific factual question already prescribed by statute. Since the determination is not a rule, it is an order. 5 U.S.C. § 551(6). The agency process for formulating an order is an adjudication. 5 U.S.C. § 551(7). Therefore, § 554 rather than § 553 of the APA is the relevant section. The same result is dictated because § 316(a) of the FWPCA is a licensing, 5 U.S.C. § 551(9), since it results in the granting or denial of a form of permission. *See* 5 U.S.C. § 551(8). A license is an order. 5 U.S.C. § 551(6).

5. Our reasons for considering the words "on the record" more important in the context of rule making are set out below.

6. Like the Ninth Circuit we consider it significant that § 509 of the FWPCA provides for judicial review of the EPA determination. The § 316 determination is reviewable under § 509(b)(1)(D) as a limitation under section 301, 302, or 306. Certainly that is an indication that the agency must be careful to provide some basis for appellate court review. But we are unable to agree that § 509, standing alone, satisfies an "on the record" requirement. *But see Marathon Oil Co., supra*, at 1263. The APA, 5 U.S.C. § 706, makes it clear that in some cases review of agency action can be had though the action was not on the record. Section 509(b)(1) of the FWPCA does not specify what kind of review the court must undertake.

an applicant for less stringent pollutant discharge limits, but is also needed to protect the public for whose benefit the very strict limitations have been enacted. If determinations such as the one at issue here are not made on the record, then the fate of the Hampton-Seabrook Estuary could be decided on the basis of evidence that a court would never see or, what is worse, that a court could not be sure existed. We cannot believe that Congress would intend such a result.

■ Our holding does not render the opening phrases of § 554 of the APA meaningless. We are persuaded that their purpose was to exclude "governmental functions, such as the administration of loan programs, which traditionally have never been regarded as adjudicative in nature and as a rule have never been exercised through other than business procedures." Attorney General's Manual on the Administrative Procedure Act 40 (1947). Without some kind of limiting language, the broad sweep of the definition of "adjudication", defined principally as that which is not rule making, 5 U.S.C. § 551(6), (7), would include such ordinary procedures that do not require any kind of hearing at all. In short, we view the crucial part of the limiting language to be the requirement of a statutorily imposed hearing. We are willing to presume that, unless a statute otherwise specifies, an adjudicatory hearing subject to judicial review must be on the record. The legislative history of the APA [7] and its treatment in the courts [8] bear us out.

This rationale and conclusion also are supported by our holding in *South Terminal Corp. v. EPA*, 504 F.2d 646, 660 (1st Cir. 1974) ("public hearing" not tantamount to "on the record"), and the other rule making cases cited to us for similar propositions.[9] The presumption in rule making cases is that formal, adjudicatory procedures are not necessary. A hearing serves a very different function in the rule making context. Witnesses may bring in new information or different points of view, but the agency's final decision need not reflect the public input. The witnesses are not the only source of the evidence on which the Administrator may base his factual findings. For these reasons, we place less importance on the absence of the words "on the record" in the adjudicatory context.

"It is believed that with respect to adjudication the specific statutory requirement of a hearing, without anything more, carries with it the further requirement of decision on the basis of the evidence adduced at the hearing. With respect to rule making, it was concluded, *supra*, that a statutory provision that rules be issued after a hearing, without more, should not be construed as requiring agency action 'on the record', but rather as merely requiring an opportunity for the expression of views. That conclusion was based on the legislative nature of rule making, from which it was inferred, unless a statute requires otherwise, that an agency hearing on proposed

7. For instance, one of the Senate documents explained the opening phrases of § 554 as follows:

   "Limiting application of the sections to those cases in which statutes require a hearing is particularly significant, because thereby are excluded the great mass of administrative routine as well as pensions, claims, and a variety of similar matters in which Congress has usually intentionally or traditionally refrained from requiring an administrative hearing. Senate Comparative Print of June 1945, p. 7 (Sen. Doc. p. 22)." Attorney General's Manual, *supra*, 41.
   We note that this document looks to whether or not an adjudicative hearing is provided, not to whether the hearing must be on the record.

See also *Marathon Oil Co., supra* at 1263 and n.31.

8. *See, e. g., Wong Yang Sung v. McGrath*, 339 U.S. 33, 50, 70 S.Ct. 445, 94 L.Ed. 616 (1950) (whether a hearing required by the Constitution triggers the APA); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (whether in the context of the particular statute a hearing is designed to produce a record that is to be the basis of agency action).

9. *United States v. Florida East Coast Ry., supra; United States v. Allegheny-Ludlum Steel Corp., supra.* The Supreme Court explicitly confined its holding to rule making cases. *Id.*, 406 U.S. at 757, 92 S.Ct. 1941.

rules would be similar to a hearing before a legislative committee, with neither the legislature nor the agency being limited to the material adduced at the hearing. No such rationale applies to administrative adjudication. In fact, it is assumed that where a statute specifically provides for administrative adjudication (such as the suspension or revocation of a license) after opportunity for an agency hearing, *such specific requirement for a hearing ordinarily implies the further requirement of decision in accordance with evidence adduced at the hearing.* Of course, the foregoing discussion is inapplicable to any situation in which the legislative history or the context of the pertinent statute indicates a contrary congressional intent." Attorney General's Manual, *supra,* 42–43 (footnote and citation to statutory history omitted) (emphasis added).

Here the statute certainly does not indicate that the determination need *not* be on the record, and we find no indication of a con-

trary congressional intent.[10] Therefore, we will judge the proceedings below according to the standards set forth in §§ 554, 556, and 557 of the APA.[11]

*Compliance with the Administrative Procedure Act*

Petitioners contend that two steps in the EPA's proceedings in this case violated the APA. We will look at each in turn.

1. The Post-hearing Submissions; The Request for Information

The Regional Administrator, in his initial decision, had determined that the record was insufficient to properly evaluate the environmental effects of backflushing. The Administrator's technical panel agreed. The Administrator asked PSCO to submit supplemental information on that subject. Other parties were given permission to comment on PSCO's submission. In addition, the Administrator provided that a hearing with respect to the submission

---

**10.** Congress refers to proceedings on the record several times in the FWPCA. On balance, we feel these references support our conclusion. The logical presumption that adjudications will be denied on the record unless otherwise specified whereas rule makings need not be unless so specified may help explain why Congress used the words "on the record" in some sections of the FWPCA but not others. In § 307(a)(2) where the phrase is used, the context is clearly rule making—making a list of pollutants. In § 310(c), 33 U.S.C. § 1320(c), the decision must be "[o]n the basis of the evidence presented". The hearing contemplated by this section results only in "recommendations", for abating international pollution and might well be thought to be a legislative type of hearing producing policy of general application.

Two subsections of § 507, 33 U.S.C. § 1367(b) and (e), state that the "hearing shall be of record and shall be subject to section 554 of title 5 [of the United States Code]." From these it is clear that Congress does not regard the reference to decision on the record as a talisman that triggers § 554 of the APA since in that case Congress would not have needed to add the explicit reference to the APA. Clearly Congress was motivated by concerns that the APA might not apply of its own force.

Finally, the phrase "on the record" appears in § 509(c) of the FWPCA, 33 U.S.C. § 1369(c), which allows a court to take additional evidence when review is sought pursuant to § 509(b) of determinations "required to be

made on the record after notice and opportunity for hearing". Of the determinations listed in § 509(b), only one must be on the record by the terms of the FWPCA. That one is § 307(a)(2) which is clearly rule making. At least some of the rest are more likely adjudications, in which case they would presumptively be on the record. Moreover, as the Seventh Circuit has pointed out, it would be curious for Congress, if it thought that only § 307 of the those sections enumerated in § 509(b) required a hearing on the record, to write § 509(c) the way it did. *United States Steel Corp. v. Train, supra,* 556 F.2d at 833. We think it clear that Congress assumed other hearings than just those pursuant to § 307 would have to be determined on the record.

**11.** We agree with the Ninth Circuit that § 558(c) of the APA "does not independently provide that full adjudicatory hearings must be held" whenever an agency must pass on an application for a license. *Marathon Oil Co., supra,* at 1261, n. 25. *But see United States Steel Corp. v. Train, supra,* 556 F.2d at 833–34. We think the language of § 558(c) applies to whatever kind of licensing proceeding the licensing statute has provided since it refers to "proceedings required to be conducted in accordance with sections 556 and 557 of [the APA] or other proceedings required by law". The most that can be said is that Congress assumed that most licensings would be governed by §§ 556 and 557.

would be held if four conditions designed to guarantee that the hearing could resolve a substantial issue of fact were met.[12] PSCO submitted the requested information. Other parties, including petitioners, submitted comments, and petitioners requested a hearing. The Administrator denied the hearing because petitioners had failed to meet the threshold conditions.

Petitioners argue, first, that the Administrator could not rely on this information because it was not part of the exclusive record for decision. 5 U.S.C. § 556(e). Second, petitioners argue that even if the information was legitimately part of the record, the Administrator was obligated to provide an opportunity for cross-examination pursuant to 5 U.S.C. § 556(d).

■ Section 556(e) provides that "[t]he transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, constitutes the exclusive record for decision . . . ." The first point to make about this section is that it does not limit the time frame during which any papers must be received. Certainly the submissions at issue were "filed in the proceeding". Moreover, 5 U.S.C. § 557(b) provides that "[o]n appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision . . . ." One of those powers is the power to preside at the taking of evidence. 5 U.S.C. § 556(b)(1). For these reasons we can find no fault with the

Administrator's decision to seek further evidence.[13] Indeed we think this procedure was a most appropriate way to gather the necessary information without the undue delay that would result from a remand.

■ The question remains, however, whether the procedures by which the Administrator gathered the information conformed to the governing law. The first point is whether the Administrator was empowered to require that the new evidence be submitted in written form. The Administrator may, under 5 U.S.C. § 556(d), so require in cases of initial licensing. This is an initial licensing. See note 2, supra. But just as the APA does not impose procedures excused by a governing statute, so the APA does not excuse procedures compelled by the governing statute. In this case § 316(a) of the FWPCA requires the EPA to afford an opportunity for a *public hearing*. We do not believe that an opportunity to submit documents constitutes a public hearing.[14] Nor do we believe that the Administrator can comply with the statute merely by taking some evidence at a public hearing and then taking the rest in written form. If that were the law, nothing would prevent the Administrator from holding a ten minute hearing to establish compliance and then requiring the submission of the rest of the evidence. Therefore, we interpret the closing lines of § 556(d) of the APA to mean that the Administrator can require evidence to be submitted in written form in initial

12. The four conditions were as follows:

1. There is a genuine and substantial issue of fact for resolution at a hearing. A hearing will not be granted on issues of policy or law.

2. The factual issue is capable of being resolved by available and specifically identified reliable evidence. A hearing will not be granted on the basis of mere allegations or denials or general descriptions of positions and contentions.

3. The data and information identified in the request for hearing, if established at a hearing, would be adequate to justify resolution of the factual issue in the way sought by the party. A hearing will be denied if, even assuming the truth and accuracy of all of the data and information submitted in support of the request for hearing, they are insufficient to justify the factual determination urged.

4. Resolution of the factual issue in the way sought by the person is adequate to justify the action requested. A hearing will not be granted on factual issues that are not determinative or controlling with respect to the action requested.

13. This holding implies a broad interpretation of 40 C.F.R. § 125.26(n)(12) which requires the Administrator to decide "matters under review on the basis of the record presented and any other consideration he deems relevant." In other words, as we state in the text, such other considerations may include expansions of the record, provided of course that the APA is complied with.

14. We do not find, either in the FWPCA or federal law generally, a definition of the term "public hearing".

licensings unless the governing statute requires a public hearing.[15] The public hearing can be especially important in cases such as this one which turn not so much upon the actual baseline data (which presumably all parties will be happy to have submitted in written form) as upon experts' interpretation of the data. The experts' credibility is, therefore, very much at issue here. *See* Attorney General's Manual, *supra*, at 78.

While we believe that it was error for the Administrator not to hold a hearing to receive the responses to his request for Information, and that therefore the submission was not properly part of the record, we cannot be sure that any purpose would be served by ordering a hearing on this issue at this stage in these proceedings. Petitioners' principal complaints are that either the Administrator could not take any evidence or that he was required to afford an opportunity for cross-examination. The latter complaint has no more basis than the former. A party to an administrative adjudicatory hearing does not have an absolute right to cross-examine witnesses. The plain language of 5 U.S.C. § 556(d) limits that right to instances where cross-examination is "required for a full and true disclosure of the facts."

█ We will order a remand for the limited purpose of allowing the Administrator to determine whether cross-examination would be useful.[16] This remand is necessary because the Administrator's threshold

conditions were designed to determine whether a hearing was necessary, not how that hearing should be conducted.[17] The parties' submissions likewise went to that somewhat distinct question. Ordinarily we might well overlook what appears to be a more theoretical than practical distinction, but we are influenced here by the fact that a remand is necessary anyway for reasons discussed below. If the Administrator finds that cross-examination would help disclose the facts a hearing must be provided at which cross-examination would be available. If, however, the Administrator concludes that cross-examination would not serve any useful purpose then we will not require him to hold a hearing merely to have the already submitted statements read into the record.[18]

2. Participation of the Technical Review Panel

Petitioners object to the Administrator's use of a panel of EPA scientists to assist him in reviewing the Regional Administrator's initial decision. The objection is twofold: first, that the Administrator should not have sought such help at all; and, second, that the panel's report (the Report) to the Administrator included information not in the administrative record.

█ Petitioners point out that by the EPA's own regulations "*[t]he Administrator shall decide* the matters under review on the basis of the record presented and any other consideration he deems relevant."

---

**15.** We note that the definition of "license", 5 U.S.C. § 551(8), is very broad and includes many matters that do not require as much of an opportunity for public participation and oversight as does the granting of a permit to discharge pollutants into the sea.

**16.** The APA commits the decision whether to allow cross-examination to the discretion of the person presiding at the hearing. 5 U.S.C. § 556(c)(5), (c)(7), and (d). *See* Attorney General's Manual, *supra*, at 78. The party seeking to cross-examine bears the burden of showing that cross-examination is in fact necessary. *See American Public Gas Ass'n v. FPC*, 162 U.S.App.D.C. 176, 498 F.2d 718, 723 (1974). Petitioners would place the burden of establishing the need for cross-examination on the same

party bearing the burden of proof as to the substantive standards set by § 316 of the FWPCA. There is no merit in that argument, however. In this instance petitioners are the proponent of a procedural order and will properly bear the burden. *Cf.* 5 U.S.C. § 556(d).

**17.** We do not mean to suggest that the conditions set by the Administrator might not serve this purpose as well, but we feel that all parties should have the opportunity to focus their arguments on the specific issue of the necessity of cross-examination.

**18.** Naturally, the Administrator's decision regarding the necessity of holding cross-examination will be subject to judicial review. 5 U.S.C. § 706(2)(A).

40 C.F.R. § 125.36(n)(12) (emphasis added). It is true that when a decision is committed to a particular individual that individual must be the one who reviews the evidence on which the decision is to be based. *See Morgan v. United States*, 298 U.S. 468, 481, 56 S.Ct. 906, 80 L.Ed. 1288 (1936). But it does not follow that all other individuals are shut out of the decision process. That conclusion runs counter to the purposes of the administrative agencies which exist, in part, to enable government to focus broad ranges of talent on particular multi-dimensional problems. The Administrator is charged with making highly technical decisions in fields far beyond his individual expertise. "The strength [of the administrative process] lies in staff work organized in such a way that the appropriate specialization is brought to bear upon each aspect of a single decision, the synthesis being provided by the men at the top." 2 K. Davis, Administrative Law Treatise 84 (1958). Therefore, "[e]vidence . . . may be sifted and analyzed by competent subordinates." *Morgan v. United States, supra*, at 481, 56 S.Ct. at 912. *Cf.* 5 U.S.C. § 557(d) (forbidding *ex parte* communications only with persons outside the agency). The decision ultimately reached is no less the Administrators simply because agency experts helped him to reach it.

■ A different question is presented, however, if the agency experts do not merely sift and analyze but also add to the evidence properly before the Administrator. The regulation quoted above cannot allow the Administrator to consider evidence barred from consideration by the APA, 5 U.S.C. § 556(e), "The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, constitutes the exclusive record for decision . . . ." To the extent the technical review panel's Report included information not in the record on which the Administrator relied,[19] § 556(e) was violated.[20] In effect the agency's staff would have made up for PSCO's failure to carry its burden of proof.

Our review of the Report indicates that such violations did occur. The most serious instance is on page 19 of the Report where the technical panel rebuts the Regional Administrator's finding that PSCO had failed to supply enough data on species' thermal tolerances by saying:

"There is little information in the record on the thermal tolerances of marine organisms exposed to the specific temperature fluctuation associated with the Seabrook operation. However, the scientific literature does contain many references to the thermal sensitivity of members of the local biota."

Whether or not these references do exist and whether or not they support the conclusions the panel goes on to draw does not concern us here. What is important is that the record did not support the conclusion until supplemented by the panel.[21] The panel's work found its way directly into the Administrator's decision at page 27 where he discusses the Regional Administrator's concerns about insufficient data but then precipitously concludes, "On the recommendation of the panel, however, I find that . . . local indigenous populations will

---

**19.** The use of the extra-record evidence must substantially prejudice petitioners in order to constitute fatal error. *United States v. Pierce Auto Freight Lines*, 327 U.S. 515, 528–29, 66 S.Ct. 687, 90 L.Ed. 821 (1946); *Marathon Oil Co., supra*, at 1265; *NLRB v. Johnson*, 310 F.2d 550, 552 (6th Cir. 1962). The Administrator's reliance on extra-record evidence for important facts, we feel, makes out such prejudice.

**20.** It is true that the Administrator stated that "I did not use the technical panel to supplement the record. The technical panel was instructed to, and did, base its recommendations on the record." Denial of Motion for Stay and Partial Grant of Motion to Add to the Record on Appeal at 9. This bald recital, however, does not forestall our independent inquiry. *See Morgan v. United States*, 298 U.S. 468, 477, 56 S.Ct. 906, 80 L.Ed. 1288 (1936).

**21.** We are not persuaded that the panel was referring to some other location in the record, for instance literature cited by a witness. Such a construction of the panel's statement would contradict its plain meaning by indicating that information not in the record might be in the record.

not be significantly affected." This conclusion depends entirely on what the panel stated about the scientific literature.

Similar, though less egregious, examples occur in the Report at pages 13–14 ("Thus, while it is true that the applicant did not perform exhaustive studies on all [Representative Important Species] it is not true that nothing is known about these species, their biology, distribution or value to the ecosystem."); page 27 ("We concur . . . that there was no evidence on the question of whether there will be any impact on wildlife, such as birds. . . . Since we conclude that holoplankton . . . are not likely to be adversely affected, it is unlikely that there would be any conceivable impact at the top of the food chain.); and page 30 ("We agree that only limited data exist on the migratory pathways of fish to and from Hampton Harbor . . .. Nevertheless there have been substantial studies performed on fish migratory behavior; some of these have been done at power plant sites.") These find their way into the Administrator's decision at pages 25–26, 33–34, and 37, respectively.

We do not challenge the reliability of the panel, nor do we question the principle that informed opinion may be able to determine that information the Regional Administrator found lacking was either unavailable or irrelevant.[22] On such issues the Administrator would be free to reverse the Regional Administrator. But the instances pointed to above, with the possible exception of page 27 of the Report, are of a different sort. The panel did not say that the information missing was unavailable or irrelevant; instead they supplied the information. They are free to do that as witnesses, but not as deciders.

The appropriate remedy under these circumstances is to remand the decision to the Administrator because he based his decision on material not part of the record. We are compelled to treat the use of the Report more severely than the use of the PSCO post-hearing submission because no party was given any opportunity to comment on the panel's Report. See generally Northeast Airlines, Inc. v. Civil Aeronautics Board, 345 F.2d 484, 486 (1st Cir. 1965). By contrast, all parties were given the opportunity to comment on PSCO's submission, and these comments were considered equally part of the record by the Administrator. We did hold that it was error to let the submission become part of the record, unless at an adjudicatory hearing. At such a hearing, however, the Administrator would have discretion to refuse cross-examination. 5 U.S.C. § 556(d). See note 16, supra. The remand on the point was to let the Administrator decide how he would use his discretion, assuming that all the materials in fact submitted had been in conjunction with an adjudicatory hearing. If the Administrator still would not allow cross-examination, then it would be pointless to require a hearing for the sole purpose of reading written statements into the record.

The Administrator will have the options of trying to reach a new decision not dependent on the panel's supplementation of the record; of holding a hearing at which all parties will have the opportunity to cross-examine the panel members and at which the panel will have an opportunity to amplify its position;[23] or of taking any other action within his power and consistent with this opinion.

---

**22.** The technical panel advanced this proposition in its report at page 1. See also the Administrator's decision at page 21. Because the following question goes to whether the decision is supported on the record rather than whether proper procedures were followed, we need not decide whether it is legitimate to examine the record "in the light of an informed scientific judgment" for the purpose of deciding that a danger is too small to require information to find out how large the danger is. See id.

**23.** We are prepared to say, on the basis of the record before us, that if the Administrator does choose to hold a hearing at which the technical panel members are witnesses, cross-examination will be "required for a full and true disclosure of the facts." 5 U.S.C. § 556(d). Consistent with our holding in respect to the PSCO submission, of course, the testimony of the panel members cannot become part of the record except at an adjudicatory hearing.

*Conclusion*

Because of this resolution, we do not reach the question of whether the Administrator's opinion was supported by substantial evidence. 5 U.S.C. § 706(2)(E). The Administrator must first set the record in order and reach his own conclusions on the state of the record as it will then stand.

*So ordered.*