582 F.2d 113
 CENTRAL AND SOUTHERN MOTOR FREIGHT TARIFF ASSOCIATION, INC.,
et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Motor Carriers Traffic Association, Inc., Intervenor.
 No. 77-1458.
 United States Court of Appeals,
First Circuit.
 Argued May 4, 1978.
Decided Aug. 14, 1978.
 
 Thomas M. Auchincloss, Jr., with whom Frank J. Weiner, Boston, Mass., Bryce Rea, Jr., David H. Coburn, and Rea, Cross & Auchincloss, Washington, D. C., were on brief, for petitioners.
 John J. McCarthy, Jr., Atty., Washington, D. C., with whom John H. Shenefield, Acting Asst. Atty. Gen., John J. Powers, III, Asst. Chief, Appellate Section, Antitrust Division, Mark L. Evans, Gen. Counsel, and Frederick W. Read, III, Associate Gen. Counsel, Washington, D. C., were on brief, for respondents.
 Michael J. Morrissey, Washington, D. C., with whom J. Raymond Clark, Washington, D. C., was on brief, for intervenor Motor Carriers Traffic Ass'n, Inc.
 Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.
 BOWNES, Circuit Judge.
 
 
 1
 Four provisions of the Interstate Commerce Commission's new rules governing the construction, filing and posting of tariffs are challenged by petitioners, Central and Southern Motor Freight Tariff Association, Inc., et al. (C&S), and intervenor, Motor Carriers Traffic Association, Inc. (MCTA). Petitioner C&S, representing itself and several other rate bureaus, and intervenor MCTA, a tariff publishing agent, between them represent the views of a substantial portion of the motor common carrier industry. The intervenor attacks three provisions of the new rules as not having a rational basis; petitioners attack one provision as exceeding the authority of the Commission under section 217 of the Interstate Commerce Act (the Act), 49 U.S.C. § 317.
 
 
 2
 In July, 1973, the Commission issued a "Notice of Proposed Rulemaking and Order," instituting a rulemaking proceeding under the provisions of section 553 of the Administrative Procedure Act, 5 U.S.C. § 553, and pursuant to sections 204(a) and 217 of the Act, 49 U.S.C. §§ 304(a) and 317. The purpose was to update the existing Commission regulations, known as Tariff Circular MF No. 3, comprising approximately fifty pages in 49 C.F.R. § 1307, governing the structure and form of tariff publications. The existing regulations had been adopted in 1940 with no general review since that time.
 
 
 3
 The notice announced proposed changes, many of which were substantial and important, in most of the existing rules. The most substantial and important changes were listed in fifty-four separate paragraphs of the notice. An appendix of two hundred forty-nine pages containing the proposed revised regulations was attached to the notice.
 
 
 4
 All motor common carriers and water carriers participating in joint rates with motor carriers were made respondents to the proceeding. The petitioners and the intervenor took an active part in the proceedings and made substantially the same objections they make here as well as others.
 
 
 5
 Petitions for reconsideration of certain of the proposed regulations were filed by several parties, including these petitioners. As a result, the proposed regulations were revised and a report was issued on August 23, 1977, by Division 2 of the Commission setting forth the latest revisions and the Commission's reasons for adopting them. A request that the entire Commission reconsider the regulations was denied by order of September 23, 1977.
 
 
 6
 There is no contention by the government that the petitioners' and intervenor's positions were not pursued at every essential step of the agency's proceedings, and they are, therefore, properly before us. 49 U.S.C. § 305(g). See United States v. Chesapeake & Ohio R. Co., 426 U.S. 500, 501 n.1, 96 S.Ct. 2318, 49 L.Ed.2d 14 (1976). The only challenge to the final regulations is to the following four provisions:
 
 
 7
 § 1310.0(c)(1) . . . Except as otherwise authorized by special tariff authority, all tariff publications filed on or after October 5, 1978, must conform to the regulations in this part. Except as otherwise authorized by special tariff authority or in (various sections), all tariff publications filed prior to October 5, 1978, which do not conform to the regulations in this part shall be brought into conformity therewith on or before October 5, 1979.
 
 
 8
 § 1310.2(d) Period of notice. Except as otherwise authorized, each tariff publication must be posted continuously from a date at least 30 days prior to the effective date . . . .
 
 
 9
 § 1310.6(f)(3) Indexes of origins and destinations.
 
 
 10
 (i) Tariffs which name specific point to point rates shall provide an index of all points from which rates apply and a separate index of all points to which rates apply . . . .
 
 
 11
 § 1310.7(f) Mixed Shipments . . . Where different rates or ratings, or different minimum quantities are so provided, there must be a statement published to the effect that the deficit, if any, in the applicable minimum weight shall be rated at the lowest rate or rating used for any commodity in the shipment.
 
 
 12
 The first three provisions are challenged by intervenor MCTA. The fourth is opposed by petitioner C&S and those it represents.
 
 
 13
 In reviewing regulations which are the product of rulemaking, we review for the limited purpose of determining whether the regulations are "rationally supported." United States v. Allegheny-Ludlum Steel Corporation, 406 U.S. 742, 749, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). Although we do not substitute our judgment for that of the agency, neither do we serve as a rubber stamp for thoughtless agency action. Ethyl Corporation v. Environmental Protection Agency, 176 U.S.App.D.C. 373, 405-410, 541 F.2d 1, 33-38 (1975), Cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).
 
 1. The Time Limits
 
 14
 MCTA objects to the two basic time requirements contained in regulation 1310.0(c)(1). The first requires that by October 5, 1978, or thirteen months after the regulations were adopted, all tariff publications presented to the Commission for filing will have to conform to the new regulations. The second time requirement is that, on October 5, 1979, twenty-five months after the regulations were adopted, all tariff publications filed prior to October 5, 1978, must conform with the regulations. The intervenor's basic contention is that the time limits are not sufficient to alleviate "the insuperable burdens that would be created if this timetable is adhered to." This is so, MCTA contends, particularly if the index requirements contained in regulation 1310.6(f)(3) are upheld. See Discussion, Infra. MCTA argues that, because the new regulations represent a drastic departure from those with which tariff publishing agents are familiar, an extensive program of reeducation and compilation of new information will be involved. It argues that a two year period will be required for the submission of new tariffs, in accordance with the revised regulations, and a five year period to bring existing tariffs into conformity with the new regulations. Nowhere in its brief does MCTA state how it arrives at its conclusion that the reeducation program will require two years and five years respectively. It overlooks the fact that the rulemaking process has already consumed five years and, presumably, MCTA and other tariff publishing agents are already familiar with the revised regulations. A rule prescribed by the Commission is presumptively valid. Ethyl Corporation, supra, 176 U.S.App.D.C. at 406-408, 541 F.2d at 34-36. The periods are not patently unreasonable and would appear to allow sufficient time for compliance, particularly since petitioners are already thoroughly cognizant of the revised regulations.
 
 
 15
 Intervenor also suggests, almost as an afterthought, that the time period of thirteen and twenty-five months should not start running until the final decision of this court. Section 17(9) of the Act, 49 U.S.C. § 17(9)(h), provides in pertinent part: "Notwithstanding any other provision of this Act, any decision, order, or requirement of the Commission, or of a duly designated division thereof, shall be final on the date on which it is served." The order adopting the new rules was served on August 23, 1977, and, therefore, became final on that date. The compliance dates of October 5, 1978, and October 5, 1979, control. The decision date of this opinion does not alter them in any way.
 
 2. The Thirty Day Period of Notice
 
 16
 Section 1310.6(d) provides that each tariff publication must be posted continuously from a date at least thirty days prior to the effective date. Intervenor's objections to the posting requirement are twofold: one, that it is an outmoded practice, and, two, that it will hold up the implementation of new rates and deprive the carriers of revenues. MCTA argues that no one ever looks at a posted tariff and, therefore, the thirty day posting requirement does not, as a practical matter, serve as a source of rate information. It states, without any documentation, that the requirement will severely "cripple the tariff bureaus." It asserts that revenues are urgently needed by the carriers and the thirty day posting time plus the time required for preparation and sending the information to the carrier for posting plus uncontrollable delays caused by the United States Postal Service will all result in a drastic reduction in revenue. These conclusory statements are posited without any supporting evidence.
 
 
 17
 The Commission points out that "posting" means "the maintenance of a file of tariffs which the public may inspect. 49 C.F.R. § 1310(f)(23)." It also points out that the posting requirement is merely a restatement of what is required under section 217(c) of the Act, 49 U.S.C. § 317(c), and that there is no evidence that this posting requirement has been a burden since its inception in 1940. To the argument of MCTA that rate information is obtained through tariff service sources and not through posted rates, the Commission replies that such sources service only the paid subscribers of the tariff agency and not the general shipping public.
 
 
 18
 Moreover, there is a safety valve relative to the thirty day posting requirement, since the statute and the agency rule expressly authorize the Commission to permit less than thirty days notice if a person can demonstrate the circumstances warranting a shorter notice. We find the time requirement is not only reasonable, but is mandated by the statute, 49 U.S.C. § 317(c).
 
 3. The Index Requirement
 
 19
 Section 1310.6(f)(3) requires that, "(i) Tariffs which name specific point to point rates shall provide an index of all points from which rates apply and a separate index of all points to which rates apply . . . ." MCTA complains that it will have to publish a colossal index naming city, town, village, or unincorporated area in every county it serves. Using the extreme example of a carrier which delivered one item to Vienna, Virginia, ten years ago, but which has not been back since, it contends that the carrier should be allowed to list only the State of Virginia or, perhaps, the counties in Virginia as its particular points of destination.
 
 
 20
 The Commission suggests that MCTA has read the regulation incorrectly and that "the required index would only need to include those cities or towns in Virginia to which the carrier has established specific rates from other cities and towns." It states specifically:
 
 
 21
 If the carrier chooses to quote its rates on a specific point to point basis, the rule reasonably requires that the carrier must assist the public in locating the rate. The rule does not apply, however, to rates which are based on mileage zones, or on states or counties. Thus, MCTA's supposed need to list ten pages of points in Virginia is nonexistent unless the carrier took the unusual step of listing specific rates from all municipalities in Virginia. To reiterate, a rate to or from all of Virginia would Not have to be indexed.
 
 
 22
 I.C.C Brief at 18-19. MCTA insists that the Commission has misread its own rule and that they will be required to provide a constant updating, changing "with every request for new to-or-from point service within its service area." We must give deference to the agency's interpretation of its own rule. If the regulation is read as the Commission says it should be, then it would not appear to impose an undue burden on MCTA or its members. Moreover, relief may be obtained if there is an undue burden: "We stress, however, that in those instances where the required indexes are not sufficiently useful to justify the expense of their compilation, applications for special tariff authority may be filed by requesting relief from the regulation." Joint Appendix at 123. We see nothing unreasonable, unfair or burdensome in the regulations as to indexes of origins and destinations.
 
 4. The Mixed Shipments Rule
 
 23
 We now turn to what is literally "much ado about nothing." The new rule for mixed shipments provides, in effect, that, when there is less than a full shipment, the charge for the empty space shall be at the lowest rate charged for any commodity in the shipment.
 
 
 24
 We start our analysis against the backdrop of the statement of National Transportation Policy, part of which is
 
 
 25
 to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices . . . .
 
 
 26
 54 Stat. 899, 49 U.S.C. preceding § 1.
 
 
 27
 "The Congress has charged the Commission with the task of determining whether the rates proposed by the carriers are 'just and reasonable.' 49 U.S.C. § 1(5)." United States v. Chesapeake & Ohio R. Co., 426 U.S. 500, 510, 96 S.Ct. 2318, 2323, 49 L.Ed.2d 14 (1976). While the technical and specific requirements of the Act cannot be flouted, the basic inquiry is whether the Commission acted fairly and the rule or rate is just and reasonable.
 
 
 28
 The main thrust of petitioners' argument is that the mixed shipment rule really amounts to setting rates, and this can only be accomplished under the procedures outlined in section 216(e) of the Act, 49 U.S.C. § 316(e), which provides in pertinent part:
 
 
 29
 Complaints to and investigation by Commission ; Power of Commission to fix reasonable rates, regulations . . . . Whenever, after hearing, upon complaint or in an investigation on its own initiative, the Commission shall be of the opinion that any individual or joint rate, fare, or charge, demanded, charged, or collected by any common carrier or carriers by motor vehicle or by any common carrier or carriers by motor vehicle in conjunction with any common carrier or carriers by railroad and/or express, and/or water for transportation in interstate or foreign commerce, or any classification, rule, regulation, or practice whatsoever of such carrier or carriers affecting such rate, fare, or charge or the value of the service thereunder, is or will be unjust or unreasonable, or unjustly discriminatory or unduly preferential or unduly prejudicial, it shall determine and prescribe the lawful rate, fare, or charge or the maximum or minimum, or maximum and minimum rate, fare, or charge thereafter to be observed.
 
 
 30
 Petitioners maintain that section 216(e) of the Act requires an adjudicatory hearing pursuant to the provisions of sections 556 and 557 of the Administrative Procedure Act, 5 U.S.C. §§ 556, 557, and that the failure to follow such provisions is fatal to the rule. Petitioners do not claim that a trial type hearing is mandated by the statute, but argue that the word "hearing" means, at least, that there be an evidentiary proceeding at which specific facts relative to whether the rate "will be unjust or unreasonable, or unjustly discriminatory or unduly preferential or unduly prejudicial" will be adduced.
 
 
 31
 Petitioners, quite consistently, next argue that section 217 of the Act, 49 U.S.C. § 317, which the Commission used as its base for updating and changing the regulations and rules, applies only to the procedure and form for tariff publication and cannot be used as a statutory authority for setting rates.
 
 
 32
 The position that the Commission took initially was that it relied not only on section 217 of the Act, but also on section 204(a)(6), 49 U.S.C. § 304(a)(6), to promulgate the mixed shipments rule.
 
 
 33
 General duties and powers of the Commission Powers and duties generally (a) It shall be the duty of the Commission
 
 
 34
 (6) To administer, execute, and enforce all provisions of this chapter, to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration . . . .
 
 
 35
 Specifically, the Commission argues that its duty under section 204(6) "to make all necessary orders" and "to prescribe rules" authorized it to promulgate the mixed shipment rule so as to effectively administer section 216(b) of the Act, 49 U.S.C. § 316(b), which provides in pertinent part:Rates, facilities for carriers of property. It shall be the duty of every common carrier of property by motor vehicle . . . to establish, observe, and enforce just and reasonable rates, charges, and classifications, and just and reasonable regulations and practices relating thereto . . . .
 
 
 36
 The Commission's reliance on section 204(a)(6) and section 216(b) would not be misplaced if it had proceeded under section 216.
 
 
 37
 It is clear, however, that the Commission proceeded solely under section 217. Section 204(a)(6) is a catchall administrative provision and the authority granted therein is subject to the more specific provisions contained in sections 216 and 217. It is not a separate grant of authority which is meant to be read in isolation from the other provisions of the Act, nor is there any legislative history or other authority cited by petitioners which would intimate otherwise. See United States v. American Trucking Associations, 310 U.S. 534, 539-540, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).
 
 
 38
 The Commission has belatedly recognized that section 216(e) is a hurdle which it must clear to establish the validity of the mixed shipments rule. Thus it now takes the position that the hearing requirements of section 216(e) were, in fact, met by the extensive five year rulemaking procedure that was followed in updating and revising the common motor carrier regulations. Petitioners' cry of foul because this argument was raised for the first time before us and its insistence that the validity of the order must be judged on the grounds originally invoked by the Commission ignores reality. We are not bound by the positions of the parties as articulated in the Commission proceedings. The question is whether the requirements of section 216(e) have, in fact, been met. This is resolved by determining whether an adjudicatory or rulemaking hearing is mandated. If the appropriate procedures were followed, it would be pointless to remand for the sole purpose of forcing the Commission to state a different section as the one under which the hearing will proceed.
 
 
 39
 We have recently held that an adjudicatory hearing may be required, even though the words "on the record" do not appear in the statute.
 
 
 40
 At the outset we reject the position of intervenor PSCO that the precise words "on the record" must be used to trigger the APA. The Supreme Court has clearly rejected such an extreme reading even in the context of rule making under § 553 of the APA. See United States v. Florida East Coast Ry. Co., 410 U.S. 224, 245, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 757, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). Rather, we think that the resolution of this issue turns on the substantive nature of the hearing Congress intended to provide.
 
 
 41
 Seacoast Anti-Pollution League v. Costle, 572 F.2d 872, 876 (1st Cir. 1978).
 
 
 42
 It seems clear that, here, the substantive nature of the hearing Congress intended to provide was fulfilled by the rulemaking process the Commission followed. Petitioners' assertion that section 216(e) requires some form of adjudicatory hearing finds no support in the Act or regulations. Compare section 15(8) of the Act, 49 U.S.C. § 15(8)(a), recently amended to provide a provision similar to section 216(e) for rail carriers, which specifies that the hearing required need not be formal: "The hearing may be conducted without answer or other formal pleading . . . ." The case law clearly indicates that rate setting as a result of a broad rule is validated by the rulemaking procedures required under section 553 of the Administrative Procedure Act, without the necessity of the hearings prescribed by sections 556 and 557 of the A.P.A.[1] In this case, the words "on the record" are not part of the pertinent section of the Act.[2] Moreover, no good reason has been advanced as to why an adjudicatory hearing is necessary. This is not the case of a specific rate having been set and evidence needed to determine whether it is fair and just. What we have here is a broad general rule that results in different rates for different shipments depending on the rate of the lowest rated article carried. Petitioners are attacking the rule, not the rate, because the rate varies with each shipment and cannot be determined until the mixed shipment is loaded. This is similar to the situation addressed by the Supreme Court in United States v. Florida East Coast R. Co., 410 U.S. 224, 245-246, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973):
 
 
 43
 While the line dividing them may not always be a bright one, these decisions represent a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other.
 
 
 44
 Here, the incentive payments proposed by the Commission in its tentative order, and later adopted in its final order, were applicable across the board to all of the common carriers by railroad subject to the Interstate Commerce Act. No effort was made to single out any particular railroad for special consideration based on its own peculiar circumstances. Indeed, one of the objections of appellee Florida East Coast was that it and other terminating carriers should have been treated differently from the generality of the railroads. But the fact that the order may in its effects have been thought more disadvantageous by some railroads than by others does not change its generalized nature. Though the Commission obviously relied on factual inferences as a basis for its order, the source of these factual inferences was apparent to anyone who read the order of December 1969. The factual inferences were used in the formulation of a basically legislative-type judgment, for prospective application only, rather than in adjudicating a particular set of disputed facts.
 
 
 45
 The Commission held what amounted to hearings over a five year period on the rule to be applied to the charge for unused air space as well as the other rules and regulations being studied for revision and updating. This is not an instance of the Commission's arbitrarily imposing a rate without giving the interested members of the industry a chance to be heard and object. The petitioners' brief, pages 21 and 22, makes it clear that its position and opposition to the rule was forcefully put forth before the Commission.
 
 
 46
 In the recent Trans Alaska Pipeline rate cases, the Supreme Court held that the Commission had the authority to suspend an initial tariff and set maximum interim rates without an adjudicatory hearing. The following language is particularly appropriate.
 
 
 47
 No principle of law requires the Commission to engage in a pointless charade in which carriers desiring to exercise their § 6(3) rights are required to submit and resubmit tariffs until one finally goes below an undisclosed maximum point of reasonableness and is allowed to take effect. The administrative process, after all, is not modeled on "The Price is Right." What the Commission did here, therefore, far from being condemnable, is an intelligent and practical exercise of its suspension power which is thoroughly in accord with Congress' goal, recognized in Arrow (Arrow Transportation Co. v. Southern R. Co.), 372 U.S. 658 at 664-666, 83 S.Ct. 984, 10 L.Ed.2d 52; See United States v. SCRAP, 412 U.S. 669, 697, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), to strike a fair balance between the needs of the public and the needs of regulated carriers.
 
 
 48
 Trans Alaska Pipeline Rate Cases, --- U.S. ----, ----, 98 S.Ct. 2053, 2066, 56 L.Ed.2d 591 (1978).
 
 
 49
 It would be a "pointless charade" to now require a hearing under section 216 on the mixed shipments rule after five years of consideration by the Commission and the industry, albeit under another section of the Act.
 
 
 50
 The remaining issue of whether there is a rational basis for the rule needs no extended discussion. While a rule that requires the minimum rather than the maximum charge for unused space in a mixed shipment may understandably upset the carriers who hereto had been using the opposite standard, there is nothing inherently unreasonable, unfair, or unjust about it. Like the Commission, we see little merit in the argument that the rule will encourage shippers to "throw-in" low rated commodities in order to gain an advantage in price for the unused space. This assumes that a shipper will husband his lowest rated articles and apportion them to different shipments. This is a lot less likely than the carriers' raising their rates, which, of course, they have a right to do subject to the Commission's determination of what is just and reasonable. The basic principle that carriers should not be allowed to charge more for empty space than what they charge for the lowest rated article is both reasonable and fair.
 
 
 51
 The orders of the Interstate Commerce Commission are affirmed.
 
 
 
 [1]
 The Supreme Court explained the interaction of rulemaking, the words of the implicated statute and the requirements of sections 553, 556, and 557 of the A.P.A. in United States v. Allegheny-Ludlum Steel, 406 U.S. 742, 756-757, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972)
 
 
 [2]
 We said in Seacoast Anti-Pollution League v. Costle, supra, 572 F.2d at 876 n. 5, that "the words 'on the record' (are) more important in the context of rule making . . . ." See Davis, Administrative Law of the Seventies §§ 6.04-1 and 6.04-2