ROCKY MOUNTAIN MOTOR TARIFF BUREAU, INC., Eastern Central Motor Carriers Association, Inc., Middle Atlantic Conference, New England Motor Rate Bureau, Inc. and Pacific Inland Tariff Bureau, Inc., Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and the United States of America, Respondents,

Motor Carriers Traffic Association, Inc., National Motor Freight Traffic Association, Inc., Central States Motor Freight Bureau, Inc., Central & Southern Motor Freight Tariff Association, Inc., Colonial Refrigerated Transportation, Inc. and Southern Motor Carriers Rate Conference, Inc., Petitioners-Intervenors,

and

National Small Shipments Traffic Conference, Drug and Toilet Preparation Traffic Conference, National Industrial Traffic League, American Camping Association, Mail Order Association, Alan J. Stoltz, Director, Camp Cody for Boys, Inc., and National Legislative Chairman, American Camping Association and Commonwealth of Pennsylvania, Respondents-Intervenors.

No. 77–1490.

United States Court of Appeals, Tenth Circuit.

Argued Aug. 10, 1978.

Decided Jan. 18, 1979.

William E. Kenworthy, Denver, Colo. (Bryce Rea, Jr., John R. Bagileo and David H. Coburn of Rea, Cross & Auchincloss, Washington, D.C., with him, on brief), for petitioners and the following intervenors: Central States Motor Freight Bureau, Inc., Central and Southern Motor Freight Tariff Association, Inc., National Motor Freight Traffic Association, Inc., and Southern Motor Carriers Rate Conference, Inc.

Kenneth G. Caplan, Washington, D.C. (Mark L. Evans, Gen. Counsel, and Frederick W. Read, III, Associate Gen. Counsel, Washington, D.C., with him, on brief), for respondent Interstate Commerce Commission.

Robert Lewis Thompson, Washington, D.C. (John H. Shenefield, Asst. Atty. Gen., and Robert B. Nicholson, Asst. Chief, App. Section, Antitrust Div., Washington, D.C., with him, on brief), for respondent United States of America.

Daniel J. Sweeney, Washington, D.C. (John M. Cutler, Jr., Washington, D.C., with him, on brief), for intervenors National Small Shipments Traffic Conference and Drug and Toilet Preparation Traffic Conference.

J. Raymond Clark, Washington, D.C., on briefs, for intervenor Motor Carriers Traffic Association, Inc.

E. Stephen Heisley of Ames, Hill & Ames, P. C., Washington, D.C., on brief, for intervenor Colonial Refrigerated Transportation, Inc.

John F. Donelan, John K. Maser, III and Renee D. Rysdahl of Donelan, Cleary, Wood & Maser, Washington, D.C., on brief, for intervenor National Industrial Traffic League.

Theodore Polydoroff and Clifford A. Wilpon of Ephraim & Polydoroff, Washington, D.C., and William J. Lippman, Denver, Colo., on brief, for intervenor American Camping Association.

David C. Todd and Linda Elizabeth Buck of Patton, Boggs & Blow, Washington, D.C., on brief, for intervenor Mail Order Association of America.

Before SETH, Chief Judge, LOGAN, Circuit Judge, and COOK, District Judge.*

SETH, Chief Judge.

This matter is before us on a petition to review and set aside orders of the Interstate Commerce Commission (ICC). The orders were entered in Ex Parte No. MC–97, *Investigation into Practices of Motor Common Carriers of Property on Residential and Redelivered Shipments.* The orders, now codified at 49 C.F.R. § 1307.35(e), state in part that tariffs of motor common carriers shall not provide for the imposition of charges, by whatever means, for movements to or from, for example, private residences, apartments, churches, schools, camps, and other such locations, which differ from otherwise applicable rates from or to other locations such as businesses, warehouses, and other generally recognized commercial locations. The rules provide for predelivery notice for shipments to such locations.

Petitioners and intervenors are motor tariff bureaus acting on behalf of their members, motor common carriers. They attack the rules as being invalid procedurally because they were adopted pursuant to the ICC's rulemaking authority. Also, as to substance, petitioners urge that the rules do not have a rational basis.

The ICC began its proceedings by issuing a Notice of Proposed Rulemaking and Order entitled Ex Parte MC–97. The purpose was to investigate (1) the legality of various charges in addition to line-haul charges assessed by motor carriers on shipments to and from private residences, churches, schools, camps, and others; and (2) the validity of charges for redelivery to such locations without prior notice of intent to deliver. All motor common carriers of property operating in interstate and foreign commerce were made respondents. The ICC directed the Bureau of Investigation and Enforcement to participate. The ICC invited written statements of facts, views, and arguments; petitioners and intervenors subsequently submitted comments.

A prehearing conference was held and no one requested oral hearings. Various parties, including petitioners, were granted permission to file briefs.

Ex Parte MC–97 was in response to public complaints concerning several industry practices. Pickup and delivery charges for non-commercial clients were included in some tariffs shortly after 1960, and the practice steadily grew to the point where most carriers applied such extra charges. The charge is generally a flat amount added to the basic line-haul rate charge applicable to commercial to commercial shipments. For example, if the shipment goes from a commercial establishment to a residential establishment, or vice versa, a charge is made for the basic line-haul and there is added a charge for the residential pickup or delivery. Residential to residential shipments pay, in addition to the line-haul rate, an additional pickup and additional delivery charge. The total charge in this situation may be twice as much as the commercial to commercial shipment of the same distance and weight. The additional charges apply regardless of pickup or deliv-

---

* Of the United States District Court for the Eastern, Northern and Western Districts of Oklahoma, sitting by Designation.

ery conditions, degree of difficulty, or time involved.

The other practice in question involves redelivery charges. Motor carriers charge consignees for attempted but unsuccessful deliveries. Carriers are not required to notify prior to delivery. This often results in redelivery charges to non-commercial consignees because they do not maintain normal business hours and usually are not available absent prior notification. Commercial establishments, on the other hand, ordinarily have someone available to accept delivery during normal office hours.

Petitioners have maintained from the very beginning that Ex Parte MC–97 was a ratemaking proceeding and the ICC's use of its rulemaking authority therefore renders the proceeding invalid. The ICC contends that it has authority to investigate general practices of the industry and promulgate rules in the public interest pursuant to sections 204(a)(1), 204(a)(6), 204(b), and 208(a) of the Interstate Commerce Act. 49 U.S.C. §§ 304(a)(1), 304(a)(6), 304(b), and 308(a). The basic procedural issue is thus whether the ICC was statutorily required to conduct evidentiary hearings in accordance with section 7 of the Administrative Procedure Act, 5 U.S.C. § 556. Petitioners argue that the purpose of Ex Parte MC–97 was to determine whether certain carrier charges were unreasonable and that the ICC could only proceed under section 216(e) of the Interstate Commerce Act. Petitioners acknowledge that an evidentiary hearing is not mandated by this section in every case in which the reasonableness of carrier charges is at issue. They contend, however, that an evidentiary hearing is required here because carriers' rates are challenged. They would thus style the proceeding as adjudicatory in nature, requiring the challenging party to shoulder the burden of proving the unreasonableness of an already effective rate. *See Central of Georgia Railroad Co. v. United States*, 379 F.Supp. 976 (D.D.C.), aff'd 421 U.S. 957, 95 S.Ct. 1944, 44 L.Ed.2d 446, 5 U.S.C. § 556.

■ Petitioners' argument is not persuasive. The Administrative Procedure Act (APA) as applied to proceedings before the ICC in *United States v. Allegheny-Ludlum Steel*, 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453, provides for both rulemaking and adjudicatory proceedings. Rulemaking is generally directed to the future and concerns general policy-type conclusions that are drawn from the facts developed. Adjudicatory proceedings are designed to determine the past and present rights and liabilities of specific parties. The several rulemaking procedures under the APA are referred to in *Allegheny-Ludlum* and it is there held that section 556 is triggered only when section 553 so requires. *See American Airlines, Inc. v. Civil Aeronautics Board*, 123 U.S.App.D.C. 310, 359 F.2d 624, and *Central and Southern Motor Freight Tariff Assn., Inc. v. I.C.C.*, 582 F.2d 113 (1st Cir.).

■ The choice of proceeding by general rulemaking procedures or by individual adjudication lies primarily in the discretion of the agency. *Securities Comm'n v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995. We must hold that the ICC properly concluded that the proceeding was not a ratemaking proceeding pursuant to section 216(e) of the Act and section 553 of the APA applied. The agency was not considering the lawfulness of the rate levels, but only whether any charges were permissible. This is not a situation in which the ICC is determining whether a published rate is just and reasonable, nor is the ICC prescribing the lawful rate to be observed. This proceeding was to consider a general industry practice which apparently had grown up without the benefit of hearings directed to the matter. It was thus a general industry practice to be examined to decide whether it should be eliminated or not. The charges had been included in tariffs filed with the ICC, but this of itself did not make the elimination of the practice a ratemaking matter to be determined only in adjudicatory proceedings.

Thus the ICC proceeded properly under APA section 553 with the authority granted by the Interstate Commerce Act. 49 U.S.C. §§ 304(a)(1), 304(a)(6), 304(b), and 308(a).

These sections collectively grant broad powers to the ICC to regulate motor common carriers. *American Trucking Assns. v. United States*, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337. Section 304(a)(1) requires the ICC to regulate common carriers and "establish reasonable requirements with respect to continuous and adequate service." Section 304(b) similarly permits the ICC to establish reasonable classifications of motor common carriers and to promulgate "just and reasonable rules, regulations, and requirements . . . as the Commission deems necessary or desirable in the public interest." Administrative and enforcement power for these provisions exists in section 304(a)(6). Section 308(a) describes the terms and conditions for certificates issued by the ICC and provides authority to issue certificates on "such terms and conditions as are necessary to carry out, with respect to the operations of the carrier, the requirements established by the Commission under section 304(a)(1) and (6) of this title . . ."

■ These sections give the ICC authority to consider and to eliminate the practices in question. Under this record additional charges based solely on the non-commercial character of a location without more certainly bear on the service to these locations; the prenotification requirement for non-commercial premises provides a service based on their particular status; and the public interest is affected by these practices. Carrier line-haul rates are based on average operating experience which includes the relatively small number of shipments to and from non-commercial premises. The practices in question singled out members of the public for additional charges. It cannot be said that this does not affect the public interest. Since these sections should be liberally construed, *Lamb v. Interstate Commerce Commission*, 259 F.2d 358 (10th Cir.), the ICC clearly did not exceed its statutory authority by considering and ruling on the practices in question under these sections. Petitioners also argue that since the sections do not mention "carrier charges" the ICC had no authority under these sections to consider charges.

These sections should not be so narrowly construed. *Lamb v. Interstate Commerce Commission*, 259 F.2d 358 (10th Cir.). The additional charges were certainly the object of the investigation, but failure to specifically include "carrier charges" does not mean that all practices involving charges are not covered by these sections. *American Trucking Assns. v. United States*, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337. We believe these sections grant the ICC authority to investigate the practices in question and to issue reasonable orders based on the evidence. In *Phillips Petroleum Co. v. Federal Power Com'n*, 475 F.2d 842 (10th Cir.), this court determined that the Commission could use a rulemaking procedure in establishing area rates. We there said:

"Accordingly, from the legislative history of the Administrative Procedure Act, it must be concluded that Congress intended to allow administrative agencies a broad latitude in adopting rulemaking procedures."

Also, we said:

"Finally, as we have noted earlier, the hearings here involve quasi-legislative rather than quasi-judicial activities. Where this is the situation, informal proceedings are generally held to be sufficient."

*See also Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312; *Federal Power Com'n v. Texaco, Inc.*, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112; and *Mobil Oil Corporation v. Federal Power Com'n*, 157 U.S.App.D.C. 235, 483 F.2d 1238.

■ Petitioners also maintain that the regulations are not supported by substantial evidence and are arbitrary and capricious. This court, in reviewing a determination which an agency is authorized to make, must judge the propriety of the determination on the grounds invoked by the agency. *Burlington Truck Lines v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207.

The rules in issue require motor carriers to eliminate charges for shipments to and from private residences, apartments, churches, schools, camps, and similar prem-

ises which differ from charges to or from businesses, warehouses, and other similar locations. The evidence before the ICC showed that noncommercial shipments amounted to one to three percent of all the traffic handled by motor carriers of property. Non-commercial gross revenues were less than one percent of the carriers' total gross revenues. Household good carriers and companies like United Parcel Service were not included because they concentrate almost exclusively on residential traffic. These carriers do not assess additional charges and, therefore, were not affected by the regulation.

A comparison of charges for equal weights and distances graphically portrays the reasons for the ICC's concern. The minimum line-haul service charge for a 50-pound package shipped from a commercial location in Denver, Colorado, to a commercial location in Kansas City, Missouri, is approximately $18.50. This includes pickup and delivery expenses which are incorporated in a carrier's average operating experience. Average operating experience provides the basis for establishing line-haul rates. If delivery or pickup is, however, to or from a non-commercial location, an additional $8.95 is charged regardless of location, street condition, distance from central business district, etc. Moreover, if pickup and delivery are from and to non-commercial locations, an additional $8.95 is paid at each end. The additional charge would apply even if the non-commercial location were next door to the commercial location.

Verified statements by many carriers repeatedly cited unfamiliar routes, narrow streets, lack of unloading facilities and assistance, delay in payments, and long distances as reasons for additional charges. There was, however, substantial evidence that a significant number of residential deliveries were repeats because many residential premises are also used to conduct a business. Salespersons, for example, often operate out of their homes. Drivers employed by Illinois and California Express, Inc., Northwest Transport Service, Inc., and Navajo Freight Lines, Inc., estimated that 50% of their residential shipments went to persons operating a business.

The record also shows that narrow streets and obstructions are not the exclusive stamp of non-commercial locations. Central business districts of major cities often have narrow streets and traffic congestion. One report, for instance, estimated that only 12% of the buildings in downtown Columbus, Ohio, had offstreet loading facilities. With regard to long distances, in *Commercial Zones and Terminal Areas*, 124 M.C.C. 130, 161, the ICC found that trade and manufacturing concerns are spreading to suburban areas.

■ The ICC found on this evidence that it was unreasonable for carriers to assess additional charges to non-commercial premises when many of them do not have the traits which were the basis for the classification. The rule is not a blanket prohibition against additional charges for pickup or delivery to certain locations. It merely declares unlawful the method employed for charging additional rates and is clearly based on substantial evidence.

49 C.F.R. §§ 1307.35(e)(2) and (3) are the prenotification rules. These rules, in essence, require a carrier to notify a non-commercial consignee prior to delivery. They permit redelivery charges only when the carrier is unable to deliver through the fault of the consignee. Redelivery charges applied to commercial and non-commercial receivers prior to the rules, but since non-commercial receivers were often not at home during business hours the charges fell almost routinely on the non-commercial receiver. Verified statements from many carriers acknowledged that prenotification for non-commercial locations was standard operating procedure. These carriers found that this was more economical and efficient, given the probability that receivers will not be at home absent notice of delivery. This evidence provides a rational basis for the rules and we must therefore conclude the rule is not arbitrary or capricious.

■ Petitioners also maintain that the prenotification requirement gives an unreasonable advantage to non-commercial loca-

tions in violation of section 216(d) of the Act, 49 U.S.C. § 316(d). Section 216(d) provides that it is unlawful for common carriers to give "any undue or unreasonable preference or advantage to any particular person, port, gateway, [or] locality." Violations of section 216(d) require that (1) a locality is unduly favored to the disadvantage of another, and (2) the transportation characteristics and circumstances surrounding the transportation for or to both groups must be substantially similar. *See Classification Ratings, Boxes or Crates*, 335 I.C.C. 754, 758. As previously discussed, prenotification is a reasonable requirement given the evidence before the ICC. Also, carriers provided prenotification because, for the purposes of effecting delivery, substantial differences exist between commercial and non-commercial locations. Petitioners thus fail to show that prenotification violates section 216(d).

The ICC in the instant case had substantial evidence before it which established that prenotification is reasonable, it does not operate to the disadvantage of commercial receivers, and commercial receivers differ from non-commercial receivers for delivery procedures. *Teamsters Joint Council 40 (J.C.) v. United States*, 238 F.Supp. 301 (W.D.Pa.), does not support petitioners' position.

■ We turn finally to petitioners' argument that the rules are arbitrary and capricious because internally inconsistent; i. e., section 1307.35(e)(1) is based on evidence showing commercial and non-commercial locations have similar characteristics and sections 1307.35(e)(2) and (3) are based on evidence showing different characteristics. We do not agree. The ICC examined two separate practices and arrived at two separate conclusions. Since substantial evidence supported both conclusions, the rules clearly were not arbitrary and capricious.

We have reviewed this ICC rulemaking under the standard prescribed in *United States v. Allegheny-Ludlum Steel*, 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453, which is as follows:

"We do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations that the Commission promulgate[d], and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported."

The procedure of the ICC, and its orders entered in Ex Parte No. MC–97, are AFFIRMED.